#068221

ORIGINAL

FILED
JUN 12 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LB&B ASSOCIATES INC., Plaintiff, | ) | No. 08-430 C |
| v. | ) | (Judge ______) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**COMPLAINT**

Plaintiff LB&B Associates Inc. ("LB&B"), complaining of the Defendant, the United States of America, states as follows:

**PARTIES AND JURISDICTION**

1. LB&B is a North Carolina corporation with its principal office and place of business in Columbia, Maryland.

2. Defendant is the United States of America (the "United States"), acting through the United States Department of the Navy, Naval Facilities Engineering Command Washington ("NAVFAC"). The United States is a sovereign government that is ultimately responsible for the actions complained of herein.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 and 41 U.S.C. §§ 601-13.

**FACTS**

4. On or about December 20, 2004, NAVFAC awarded a contract to LB&B for the maintenance and repair of facilities and the incidental handling of hazardous waste, under Contract No. 53-3K06-3-0200 (the "Contract"). The primary locations of service under the

Contract were the Washington Navy Yard, the National Navy Medical Center (Bethesda, Maryland), the Naval Research Laboratory, the Naval Station (Anacostia), the Nebraska Avenue Complex, the United States Naval Observatory, and the Potomac Annex. Services were also required at other locations as well.

5. The Contract was a combination of Firm-Fixed Price work and Indefinite Delivery/Indefinite Quantity ("IDIQ") work.

6. The Contract was for a base period from April 1, 2005 through March 31, 2006, with four one-year option periods.

7. Throughout performance of the Contract, as described in more detail herein, LB&B encountered problems in that NAVFAC contracting personnel repeatedly required LB&B to perform work not required by the Contract and/or otherwise caused LB&B to incur increased costs in its performance of the Contract. On information and belief, these problems were caused, in part, by NAVFAC's misunderstanding of the Contract's Statement of Work, which NAVFAC officials admitted was poorly written.

8. In response to NAVFAC's actions described above, LB&B submitted certified claims, described herein, seeking equitable adjustments in the Contract price to recover the increased costs incurred by LB&B.

9. Each of the claims filed by LB&B that are at issue in this action was filed within all applicable statutes of limitations and repose, and all conditions precedent have been performed or have occurred.

10. This action was filed within all applicable statutes of limitations and repose, and all conditions precedent have been performed or have occurred.

**COUNT I: EXCESS COSTS ASSOCIATED WITH HAZARDOUS WASTE MANAGEMENT SERVICES**

11. The allegations of Paragraphs 1 through 10 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

12. Section C.5.2.3 of the Contract required LB&B to provide hazardous waste disposal management services.

13. In its proposal in response to the solicitation for the Contract, LB&B proposed to perform the hazardous waste disposal management services with its own personnel; i.e., LB&B did not propose to subcontract those services.

14. NAVFAC accepted LB&B's proposal with regard to the performance of the hazardous waste disposal management services, and LB&B's proposal was incorporated into the Contract.

15. After LB&B began performance of the Contract, NAVFAC expressed concerns regarding LB&B's performance of the hazardous waste disposal management services.

16. In fact, however, many of LB&B's alleged and perceived performance problems were the result of interference with LB&B's performance and personnel by NAVFAC personnel and/or other improper action or inaction by NAVFAC.

17. LB&B's alleged and perceived performance problems culminated in the issuance of a show cause letter to LB&B on February 14, 2006. The show cause letter stated that NAVFAC was considering partially terminating the contract by terminating the hazardous waste management function. The show cause letter invited LB&B to respond within ten days.

18. On February 15, 2006, a meeting was held between LB&B and NAVFAC representatives. At that meeting, LB&B offered suggestions as to how it could resolve any perceived problems with LB&B's performance of the hazardous waste management services.

NAVFAC, however, rejected those suggestions out of hand and insisted that LB&B hire a subcontractor to perform the hazardous waste management services. In fact, NAVFAC continued to threaten LB&B that it would terminate this portion of the Contract if LB&B did not hire a subcontractor for these services.

19. NAVFAC's position in this regard was confirmed in a February 15, 2006 electronic mail from Edward Charette, then-Contracting Officer for the Contract, to James Dell of LB&B. Mr. Charette's electronic mail unequivocally demanded that LB&B hire a subcontractor to perform the hazardous waste management services, under threat of termination of those services, stating:

> To clarify the government's position at the meeting this morning, and simply put, we are prepared to terminate the Hazardous Waste Management portion of the contract, unless you take our recommendation that you hire a dedicated subcontractor, approved by us, for that portion of the work.

Mr. Charette's electronic mail repeatedly emphasized that any subcontractor would have to be approved by NAVFAC and identified two "recommended sources."

20. In order to avoid termination, LB&B hired a subcontractor as directed by NAVFAC and Mr. Charette. In doing so, LB&B incurred substantially increased costs versus the costs of LB&B performing these services in-house, as LB&B had proposed and as the Contract provided.

21. The subcontractor hired by LB&B in turn simply hired the vast majority of its personnel from the pool of LB&B personnel that had previously performed the hazardous waste management services for LB&B in-house. However, after LB&B subcontracted these services, NAVFAC raised no further issues regarding the performance of these services. Given that essentially the same personnel were providing the services both before and after the work was subcontracted, yet NAVFAC expressed no concern with the work performed by these personnel

after the work was subcontracted, raises serious doubts regarding the validity of NAVFAC's purported concerns with the performance of these services by LB&B.

22. NAVFAC's demand that LB&B subcontract .the hazardous waste management services exceeded the requirements of the Contract and constituted a constructive change to LB&B's contract that caused LB&B to incur additional costs of performance.

23. On March 21, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer, for the increased costs associated with subcontracting the hazardous waste management services, seeking an equitable adjustment in price under the Contract in the amount of $208,889.16, and requesting a Contracting Officer's final decision.

24. On July 10, 2007, the Contracting Officer issued a final decision, denying LB&B's claim.

25. LB&B is entitled to compensation for its increased costs in the amount of $208,889.16, or such greater or lesser amount to be established at trial, plus interest.

**COUNT II: EXCESS COSTS ASSOCIATED WITH ADDITIONAL GOVERNMENT-REQUIRED SITE SUPERVISION**

26. The allegations of Paragraphs 1 through 25 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

27. The Contract did not require that LB&B have on-site, full-time supervision at the smaller worksite locations of the Naval Air Facility Andrews, the Defense Information Systems Agency at the Arlington Service Center, or the United States Naval Observatory.

28. Despite the lack of any Contractual requirements to do so, NAVFAC, at various times, required LB&B to provide on-site, full-time supervision at these locations.

29. NAVFAC's demand that LB&B provide on-site, full-time supervision at these locations exceeded the requirements of the Contract and constituted a constructive change to LB&B's contract that caused LB&B to incur additional costs of performance.

30. On March 28, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer for the increased costs associated with NAVFAC's requirement for additional site supervision, seeking an equitable adjustment in price under the Contract in the amount of $204,068.92, and requesting a Contracting Officer's final decision.

31. On June 12, 2007, the Contracting Officer issued a final decision, denying LB&B's claim.

32. LB&B is entitled to compensation for its increased costs in the amount of $208,889.16, or such greater or lesser amount to be established at trial, plus interest.

**COUNT III: EXCESS COSTS ASSOCIATED WITH UNCOMPENSATED PLANNING AND ESTIMATING WORK**

33. The allegations of Paragraphs 1 through 32 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

34. During performance of the Contract, NAVFAC required LB&B to plan and estimate work for over one hundred (100) IDIQ task orders that were never awarded under the Contract. Instead, on information and belief, NAVFAC awarded most if not all of the work contemplated by the task orders to other contractors after LB&B had planned and estimated the work and submitted a proposal to NAVFAC for the work.

35. NAVFAC was essentially using LB&B as a government estimator, such that LB&B was doing planning and estimating work that should have been done by a Navy Contracting Officer and Engineering Technician.

36. LB&B expended considerable effort in planning and estimating the work as required by NAVFAC, as well as in gathering proposals from potential subcontractors.

37. NAVFAC's demand that LB&B perform the functions of a government estimator exceeded the requirements of the Contract and constituted a constructive change to LB&B's contract that caused LB&B to incur additional costs of performance.

38. On March 29, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer for the increased costs associated with NAVFAC's requirement that LB&B perform planning and estimating work, seeking an equitable adjustment in price under the Contract in the amount of $14,002.65, and requesting a Contracting Officer's final decision.

39. On June 25, 2007, the Contracting Officer issued a final decision, denying LB&B's claim.

40. LB&B is entitled to compensation for its increased costs in the amount of $14,002.65, or such greater or lesser amount to be established at trial, plus interest.

## COUNT IV: EXCESS SUPERVISORY COSTS ASSOCIATED WITH CEREMONIAL DUTIES

41. The allegations of Paragraphs 1 through 40 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

42. Under Section C.5.3.2, LB&B was required to provide ceremonial support for all National Capital Region professional ceremonial support requirements such as official ceremonies, retirements and other events.

43. Section C.5.3.2 incorporated Attachment J-C.5.5, which provided historical data regarding the performance of ceremonial duties.

44. Attachment J-C.5.5 included Figure 6e, titled "Indefinite Quantity: Breakout of Ceremony Only Trade Distribution (FY 02)." That chart identified the personnel used to

perform the ceremonial duties. The only personnel identified were Plumber/Pipefitter, Carpenter, Electricians, Sheet Metal Mechanic and Indirect Labor. No supervisory personnel were included in the chart.

45. There was no requirement in Section C.5.3.2, in Attachment J-C.5.5, or otherwise in the Contract for LB&B to have a supervisor on-site during the set up for ceremonial services or during the ceremonial services.

46. Despite the lack of any Contractual requirements to do so, NAVFAC, at various times, required LB&B to provide an on-site supervisor during the set up for ceremonial services and during the entirety of the ceremonial services.

47. NAVFAC's demand that LB&B have a supervisor on-site during the set up for ceremonial services as well as during the entirety of ceremonial services exceeded the requirements of the Contract and constituted a constructive change to LB&B's contract that caused LB&B to incur additional costs of performance.

48. On March 21, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer for the increased costs associated with the excess supervisory costs associated with ceremonial duties, seeking an equitable adjustment in price under the Contract in the amount of $33,646.53, and requesting a Contracting Officer's final decision.

49. On July 27, 2007, the Contracting Officer issued a final decision, denying LB&B's claim.

50. LB&B is entitled to compensation for its increased costs in the amount of $33,646.53, or such greater or lesser amount to be established at trial, plus interest.

## COUNT V: DEDUCTIONS RESULTING FROM EXCESS EMERGENCY SERVICE CALLS

51. The allegations of Paragraphs 1 through 50 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

52. Attachment J-C.5.5 of the Contract provided historical data regarding the historical numbers of service calls at the sites covered by the Contract and identified the number of emergency service calls per year for all Contract sites totaled 896, with one percent (1%) of those calls (approximately nine (9)) being at the National Naval Medical Center ("NNMC").

53. Despite this representation in Attachment J-C.5.5 of the Contract, instead of nine (9) emergency service calls per year at the NNMC, LB&B had 736 emergency service calls at NNMC in the first year of the Contract, and 1053 emergency service calls at NNMC in the second year of the Contract.

54. Section 5.2.1 of the Contract required LB&B to respond to emergency service calls in thirty (30) minutes or less; therefore, responding to the significantly higher number of emergency service calls above and beyond that represented in the solicitation for the Contract was very disruptive to LB&B's normal work on urgent and routine service calls, as well as on the completion of preventive maintenance work.

55. Indeed, the inordinate amount of time spent responding to the extremely high numbers of emergency service calls resulted in deductions being taken to the Contract price due to LB&B's inability to complete all preventive maintenance obligations at NNMC in a timely manner.

56. Specifically, under Modification Number P00009 to the Contract, NAVFAC deducted a total of $15,719.16 as a result of LB&B's inability to complete all preventive maintenance obligations at NNMC in a timely manner.

57. Because LB&B's inability to complete all required preventive maintenance obligations at NNMC, and the resulting deduction to LB&B's Contract price, was the direct result of the excess emergency service calls ordered by NAVFAC, LB&B is entitled to a return of the deductions taken by NAVFAC under Modification Number P00009.

58. On March 28, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer for return of the deductions taken from LB&B's Contract price under Modification Number P00009, seeking an equitable adjustment in price under the Contract in the amount of $15,719.16, and requesting a Contracting Officer's final decision.

59. On September 18, 2007, the Contracting Officer issued a final decision, denying LB&B's claim.

60. LB&B is entitled to return of the deductions taken under Modification Number P0009 in the amount of $15,719.16, or such greater or lesser amount to be established at trial, plus interest.

**COUNT VI: UTILITY WORK UNDER 16 HOURS**

61. The allegations of Paragraphs 1 through 60 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

62. Section C.1.2.3 of the Contract specifically excludes utility system maintenance from the Contract: "utility system maintenance . . . [is] specifically excluded from the scope of the contract."

63. Despite the specific exclusion of utility system maintenance from the Contract, NAVFAC ordered LB&B to perform a substantial amount of utility system maintenance.

64. NAVFAC's demand that LB&B perform utility system maintenance work exceeded the requirements of the Contract and constituted a constructive change to LB&B's contract that caused LB&B to incur additional costs of performance.

65. On December 13, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer for the increased costs associated with NAVFAC's ordering LB&B to perform utility system maintenance, seeking an equitable adjustment in price under the Contract in the amount of $47,584.74, and requesting a Contracting Officer's final decision.

66. On March 6, 2008, the Contracting Officer issued a final decision, denying LB&B's claim.

67. LB&B is entitled to compensation for its increased costs in the amount of $47,584.74, or such greater or lesser amount to be established at trial, plus interest.

**COUNT VII: IDIQ PROJECTS**

68. The allegations of Paragraphs 1 through 67 of this Complaint are hereby realleged and incorporated herein by reference as if fully set forth.

69. NAVFAC required LB&B to complete two IDIQ projects for which LB&B has not been compensated.

70. Under the first IDIQ project, on January 16 and 17, 2007, LB&B was directed to and did remove all maintenance items from Mechanical Rooms 3200 and 3700 in Building 9 at the NNMC so that another contractor could change out the air handling units in these rooms.

71. LB&B incurred costs of $9,082.80 related to this first IDIQ project.

72. Under the second IDIQ project, on March 3 and 4, 2007, LB&B was required to and did expend overtime in preparation for an inspection at the NNMC prompted by (on

information and belief) the February, 2007 exposé of instances of neglect, unsatisfactory conditions and poor management at the Walter Reed Army Medical Center.

73. LB&B incurred costs of $21,469.96 related to this second IDIQ project.

74. To date, LB&B has not been paid for the costs incurred in connection with these two IDIQ projects.

75. On November 9, 2007, LB&B submitted a certified claim to Paul Heavey, the then-Contracting Officer, for the costs incurred in connection with these two IDIQ projects, seeking an equitable adjustment in price under the Contract in the amount of $30,522.76, and requesting a Contracting Officer's final decision.

76. On March 6, 2008, the Contracting Officer issued a final decision, denying LB&B's claim.

77. LB&B is entitled to compensation for its costs incurred in connection with these two IDIQ projects in the amount of $30,522.76, or such greater or lesser amount to be established at trial, plus interest.

**PRAYER FOR RELIEF**

WHEREFORE, LB&B prays that this Court grant the following relief:

1. That the Court order the United States to pay to LB&B the sum of $554,463.92, or such greater or lesser amount to be established at trial; and

2. That the Court order the United States to pay to LB&B interest on all amounts found to be due and owing to LB&B, pursuant to, *inter alia*, 41 U.S.C. § 611; and

3. That the Court grant LB&B its attorneys' fees to the extent allowed by law; and

4. The Court grant such other and further relief to LB&B as the Court deems just and proper.

This the 11th day of June, 2008.

WYRICK ROBBINS YATES & PONTON LLP

Benjamin N. Thompson
Post Office Drawer 17803
Raleigh, North Carolina 27619
Telephone: (919) 781-4000
Facsimile: (919) 781-4865
bthompson@wyrick.com

COUNSEL OF RECORD FOR LB&B ASSOCIATES INC.

OF COUNSEL:

Jennifer M. Miller
Wyrick Robbins Yates & Ponton LLP
Post Office Drawer 17803
Raleigh, North Carolina 27619
Telephone: (919) 781-4000
Facsimile: (919) 781-4865
jmiller@wyrick.com