# In the United States Court of Federal Claims

No. 08-430 C

(E-Filed:  January 22, 2010, Under Seal)
(Refiled:  February 3, 2010)[1]

| | |
|---|---|
| LB&B ASSOCIATES INC., | ) Summary Judgment; Hazardous |
| | ) Waste Management Services |
| Plaintiffs, | ) Contract; Constructive Change of |
| | ) a Contract; Equitable Adjustment |
| v. | ) of a Contract |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Benjamin N. Thompson, Raleigh, NC, for plaintiff.  Jennifer M. Miller, Raleigh, NC, of counsel.

Russell A. Shiltis, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Kirk Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Damon Martin, Senior Trial Attorney, Naval Facilities Engineering Command, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Chief Judge

Before the court is an action brought by LB&B Associates Inc. (LB&B or plaintiff) for the equitable adjustment of the price of its Contract No. N26477-01-D-0146

---

[1] This Opinion was filed under seal on January 22, 2010.  The court requested that if any party believed that the January 22, 2010 Opinion contained protected material that should be redacted before publication, that party shall, by motion filed on or before February 1, 2010 request that such protected material be redacted.  The court has received no motions from either party requesting that the January 22, 2010 Opinion be redacted in any way.  The court therefore publishes the January 22, 2010 Opinion in its entirety.

(Contract) with the United States (government, defendant or United States), acting through the United States Department of the Navy, Naval Facilities Engineering Command Washington (NAVFAC), for the maintenance and repair of facilities and the incidental handling of hazardous waste.  See Plaintiff LB&B Associates Inc.'s Memorandum In Support of its Motion for Partial Summary Judgment (plaintiff's Memorandum or Pl.'s Mem.) 1, Docket Number (Dkt. No.) 16.

I.      Background

       A.      Procedural Background

       On June 12, 2008, LB&B filed its Complaint (Complaint or Compl.), Dkt. No. 1. On June 30, 2009, LB&B filed Plaintiff LB&B Associates Inc.'s Motion for Partial Summary Judgment (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 18, supported by plaintiff's Memorandum including plaintiff's Proposed Finding of Uncontroverted Facts (plaintiff's Facts or Pl.'s Facts), Exhibit 1 (Pl.'s Exh. 1), Affidavit of Chad Lewis (Lewis Aff.) and Exhibit 3 (Pl.'s Exh. 3), Declaration of James Dell (Dell Decl.).  See Dkt. No. 16.  On August 21, 2009, the United States filed Defendant's Response to Plaintiff's Motion for Partial Summary Judgment and Cross Motion for Partial Summary Judgment Regarding Counts I and II (defendant's Response or Def.'s Resp.), Dkt. No. 25; Defendant's Proposed Findings of Uncontroverted Fact (defendant's Facts or Def.'s Facts), Dkt. No. 26; and Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact (defendant's Response to Facts or Def.'s Resp. Facts), Dkt. No 24. Defendant also filed an Appendix to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment and Cross Motion for Partial Summary Judgment Regarding Counts I and II (defendant's Appendix or Def.'s App.), Dkt. No. 26.  On October 2, 2009 LB&B filed Plaintiff's Reply in Support of Plaintiff's Motion for Partial Summary Judgment and Response to Defendant's Cross Motion for Partial Summary Judgment Regarding Counts I and II (plaintiff's Reply or Pl.'s Reply), Dkt. No. 31, and Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts (plaintiff's Response to Facts or Pl.'s Resp. Facts), Dkt. No 32.  On October 15, 2009, the United States filed Defendant's Reply in Support of Cross Motion for Partial Summary Judgment Regarding Counts I and II (defendant's Reply or Def.'s Reply), Dkt. No. 33.

       In Count I, plaintiff asserts that it was required, at the direction of the government, to hire a subcontractor to perform hazardous waste management services.  Pl.'s Mem. 4-5. Plaintiff asserts that the use of a subcontractor constitutes a constructive change to the Contract and that it is owed the additional costs that it incurred in hiring the subcontractor.  Id. 5-6.  Defendant asserts that the Contract is a performance contract and

therefore plaintiff is responsible for all costs it incurs as may be necessary to complete performance under the contract.  Def.'s Resp. 5-6.

In Count II, plaintiff asserts that NAVFAC directed plaintiff to provide additional personnel for on-site, full-time supervision.  Pl.'s Mem. 5-6.  Plaintiff asserts that NAVFAC's demand for additional personnel constituted a constructive change.  Id. 12.  Defendant asserts, again, that the portion of the Contract at issue is a performance contract, and therefore plaintiff is responsible for all costs necessary to complete performance under the Contract.  Def.'s Resp. 8-10.

B.      Factual Background

1.      The Contract

On August 13, 2003, the government, acting through NAVFAC, issued Solicitation No. N62477-01-R-0146 (Solicitation) seeking offers for the maintenance and repair of facilities, systems and equipment services for the Navy Public Works Center, Washington, DC and its customers at various locations throughout the Washington, DC area.  Pl.'s Facts 2-3; Def.'s Resp. Facts 1.  On December 20, 2004, NAVFAC awarded the Contract to LB&B for the maintenance and repair of facilities and the incidental handling of hazardous waste.  Pl.'s Facts 4; Def.'s Resp. Facts 1.  The primary locations of services were to be Washington Navy Yard, National Naval Medical Center at Bethesda, Maryland (NNMC), Naval Research Laboratory (NRL), Naval Station Anacostia, Walter Reed Army Medical Center, Nebraska Avenue Complex, United States Naval Observatory and Potomac Annex.  Def.'s App. 1, § C, at 1.1.1; Pl.'s Facts 3; Def.'s Facts 2.

The Contract was a mixed contract; certain portions were firm-fixed-price and the remainder was an indefinite quantity (IDQ) contract.  Compl. ¶ 5; Def.'s App. 1, § C, at 1.1.2.  The handling of hazardous materials and wastes generated by the service provider are specifically included within the scope of the firm-fixed-price contract.  Pl.'s Mem. 3; Def.'s App. 1, § C, at 1.1.2.  Plaintiff's proposed price was intended to cover all items including "direct and indirect labor cost, management, materials, [and] supervision" as required to meet the performance requirements of the Contract.  Lewis Aff., Exh. A, § C, at 1.2.1; Def.'s App. 1, § C, at 1.2.1.  The Contract described the specific work requirement for hazardous waste disposal management as "[p]roviding customer Hazardous Waste management support [and] [s]tanding by 24 hours a day to provide customer support in the event a cleanup is required."  Lewis Aff., Exh. A, § C, at 1.2.2; Def.'s App. 1, § C, at 1.2.2.  Specifically, with regard to the disposal of hazardous waste, the Solicitation provides:

The Service Provider will be required to dispose of hazardous waste under the terms of this contract. The Service Provider is responsible for disposal of incidental quantities of hazardous waste. The Service provider shall dispose of hazardous waste at a site approved by the Contracting Officer and ensure that disposal is performed in accordance with 40 [C.F.R. §] 260 through 40 [C.F.R. §] 279 and any other applicable Federal, Navy, State, Navy [sic], and local laws and regulation as well as consent orders/consent agreements covering the Washington Navy Yard and Anacostia.

Lewis Aff., Exh. A, § C, at 1.5.12.4; Def.'s App. 1, § C, at 1.5.12.4. The Contract contained both a list of general duties and detailed waste disposal procedures and instructions for each site.[2] Def.'s App. 1, § J-C.1.3.

---

[2] Contract No. N26477-01-D-0146 (Contract) included a list of duties that are routinely performed by Service Provider personnel in managing a Hazardous Waste (HW) facility. See Appendix to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment and Cross Motion for Partial Summary Judgment Regarding Counts I and II (defendant's Appendix or Def.'s App.) 1, § J-C.1.3, at 6-7. The Contract required that plaintiff:

1. Coordinate, track, label, pick up and transport wastes, including [Resource Conservation and Recovery Act (RCRA)] hazardous wastes (HW), non-RCRA, and [o]ily wastes from the generator site to the hazardous waste storage facility.

2. Oversee operations at the site's HW storage facility including but not limited to: weekly inspections, keeping the space clean and orderly, and notification to the environmental Program Manager of any mechanical, electrical, plumbing or other regulatory compliance problems.

3. Maintain a current inventory of all HW, non-RCRA and oily waste being stored in the storage facilities at all times.

4. Complete all disposal/recycling documentation for removal of HW, non-RCRA and oily wastes from the HW storage facility.

5. Oversee all operations performed on site by contractors, recycling contractors or any other contractors that remove HW from the storage facility.

6. Ensure that manifests accompanying waste removed from the site are accurate and complete. A Service Provider representative may sign manifests if authorized by the activity. If not authorized, manifests will be signed by the authorized customer representative. Manage all manifests to ensure that the return manifest arrives from the [Treatment, Storage and Disposal Facilities] TSDF within the

In addition to the provisions specifically required by the Contract, plaintiff was required to follow all applicable federal, state and local laws and regulations.  Lewis Aff., Exh. A, § C, at 1.5.12.4; Def.'s App. 1, § C, at 1.5.12.4.  Plaintiff was required to complete all records required by any local, state or federal agency pursuant to the Environmental Protection Agency's (EPA's) hazardous waste laws, and to maintain all records on-site at all times.  Lewis Aff., Exh. A, § C, at 1.5.2.3; Def.'s App. 1, § C, at 1.5.2.3.  Plaintiff was required to mark and label each container containing hazardous waste in compliance with EPA regulations.  Lewis Aff., Exh. A, § C, at 5.2.3.2.8; Def.'s

---

regulatory time frame.  If the manifest is not received within the allowed time frame, the service Provider shall draft and forward for customer signature an exception report.

7.  Maintain all documentation on site and in a neat and organized manner that is always accessible to your representatives.  All documentation shall be tracked "cradle to grave" using an electronic database.

8.  Participate in all waste inspections conducted by [Environmental Protection Agency (EPA)], state or other responsible organizations.

9.  All Service Provider workers have current training and certification of 40 hour [Hazardous Waste Operation and Emergency Response (HAZWOPER)] and are certified to use a respirator.  All training and medical surveillance is provided by the Service Provider.  Copies of training and medical records shall be maintained at your facility.

10.  The Fire Department is usually the first responder to a large spill of [Hazardous Material (HM)] or HW.  The Service Provider shall assist in the containment and clean up.

11.  Generate all federal, state and locally required annual reports and/or summaries for any and all wastes.

12.  Coordinate, track and maintain records of all lab analyses and identification for any unknown wastes at the site.

13.  As needed plan, develop and conduct training sessions for waste generators.

14.  Provide a monthly statement of all labor hours expended, lab analysis and disposal costs.

Id.

App. 1, § C, at 5.2.3.2.8.  Plaintiff was further required to label all hazardous waste containers and maintain an inventory throughout the year documenting the type of hazardous materials and the quantities of each material.  48 C.F.R. § 52.223-3 (2009); Lewis Aff., Exh. A, § C, at 1.7.4.2; Def.'s App. 1, § C, at 1.7.4.2.  Within fifteen days after the calendar year – and at the end of the Contract – plaintiff was directed to turn in the inventory of hazardous materials to the government.  Lewis Aff., Exh. A, § C, at 1.7.4.2; Def.'s App. 1, § C, at 1.7.4.2.

The Contract incorporates certain provisions of the Federal Acquisition Regulation (FAR).  See Def.'s App 1, §§ E-I.  Certain FAR provisions are incorporated in full text and others are incorporated by reference.[3]  See, e.g., id. 1 § I, at 19 ("This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text.").  Clauses that are incorporated by reference include FAR § 52.249-2, Termination for Convenience Of The Government (Fixed-Price) and FAR § 52.249-8, Default (Fixed-Price Supply & Service).  Id. 1 § I, at 4; see 48 C.F.R §§ 52.249-2, 52.249-8 (2009).  FAR § 52.249-2 permits the government to terminate performance of a contract if the Contracting Officer (CO) determines that termination of the contract is in the best interest of the government.  48 C.F.R. § 52.249-2(a) (2009) ("The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest.").  FAR § 52.249-8 permits the government to terminate the Contract in whole or in part if the contractor fails to perform any service required under the contract.  48 C.F.R. § 52.249-8(a)(1) (2009) ("The Government may . . . terminate . . . this contract in whole or in part if the Contractor fails to . . . perform the services within the time specified in this contract . . . .").  If the government terminates the contract, the

---

[3] The parties have not mentioned – nor has the court been able to find – any reference to the incorporation into the contract of FAR § 49.402-2.  See Def.'s App. 1, § I; Def.'s App. 33.  The government cites FAR § 49.402-4 in its February 15, 2006 e-mail requiring plaintiff to hire a subcontractor or have the hazardous waste management services portion of the contract terminated.  Def.'s App. 33, at 5-6; see 48 C.F.R. § 49.402-4 (2008).  FAR § 49.002 states that section 49 "applies to contracts that provide for termination for the convenience of the Government or for the default of the contractor . . . ."  C.F.R. § 49.002(a) (2008).  The Contract expressly provides for termination for the convenience of the government.  See Def.'s App. 1 § I, at 4; 48 C.F.R. § 52.249-2(a) (2009).  Further, plaintiff has not asserted that the government's reliance on FAR § 49.402-4 was improper and, given that FAR § 49.402-4 appears to detail a method of implementing clause (4) of the Contract provision titled "Consequences of Contractor's Failure to Perform Required Services," the court finds defendant's invocation of FAR § 49.402-4 proper.

contractor is liable to the government for excess costs of supplies or services the government incurs in fulfilling the terms of the contract.  Id. § 52.249-8(b) (2009).

Also included in the Contract is a section titled "Consequences of Contractor's Failure to Perform Required Services."  Def.'s App. 1, § E, at 3-5, § 5252.246-9303. This section reserves to the government surveillance rights and the right to inspect and to ensure that all requirements and standards are met.  Id. 1, § E, at 4.  "In the case of unsatisfactory or nonperformed work the Government:  (1) may give the Contractor written notice of observed deficiencies prior to deduction for unsatisfactory or nonperformed work . . . [or] (4) may, at its option, perform work by Government personnel or by other means."[4]  Id. 1, § E, at 4, § 5252.246-9303(c).  Under the terms of the Contract, the government had the option to require the Contractor to re-perform work that the government found was unsatisfactory at no additional cost to the government. See id. 1, § E, at 4, § 5252.246-9303(c)(2).  Alternatively, the government also reserved its right to perform the work by other means.  See id. 1, § E, at 4, § 5252.246-9303(c)(4).

Included as an attachment to defendant's February 15, 2006 e-mail was FAR § 49.402-4.  In lieu of termination, FAR § 49-402.4(b) gives the government the option to "[p]ermit the contractor to continue performance of the contract by means of a subcontract . . . ."  48 C.F.R. § 49.402-4(b) (2008).  If termination for default would be appropriate, FAR § 49.402-4 expressly permits the government to revise the delivery schedule and make arrangements to continue the contract with an acceptable third party. Id.  Defendant told plaintiff that it intended to terminate the hazardous waste management portion of the contract unless plaintiff hired a subcontractor to complete the remainder of the Contract.  Def.'s App. 33, at 5-6.

Section C of the Contract at 1.3 is titled "Management" and is intended to provide guidance about the level of management required under the Contract.  Lewis Aff., Exh. A, § C, at 1.3; Def.'s App. 1, § C, at 1.3.  The Contract requires that the contractor "[m]anage the total work effort associated with the services required."  Lewis Aff., Exh. A, § C, at 1.3.2; Def.'s App. 1, § C, at 1.3.2.  The contractor is further directed to "[e]mploy professionally and technically qualified personnel to perform the tasks specified," Lewis Aff., Exh. A, § C, at 1.3.3.1; Def's App. 1, § C, at 1.3.3.1; the contractor must ensure that "[p]ersonnel shall be able to read, comprehend, and converse in the English language," Lewis Aff., Exh. A, § C, at 1.3.3.4; Def.'s App. 1, § C, at

---

[4] Section E of Contract No. N264-77-D0146 (Contract) was suspended by modification P00003.  Def.'s App. 17, at 3-4.  Modification P00003 replaced the March 1996 version of section 5252.246-9303 with a version dated March 2002.  Id.  Sub-sections (a) and (c)(4), the only subsections relevant to the issue before the court, remained unchanged.  Id.

1.3.3.4; and the contractor must ensure that personnel "[c]onduct themselves in a proper, efficient, courteous and businesslike manner," Lewis Aff., Exh. A, § C, at 1.3.3.6; Def.'s App. 1, § C, at 1.3.3.6.  The Contract requires that the contractor provide "a qualified management staff with the experience and expertise necessary to assure competent and complete contract performance."  Lewis Aff., Exh. A, § C, at 1.3.4; Def.'s App. § C, at 1.3.4.  The Contract does not provide further specifics concerning the anticipated level of management effort required to assure "competent and complete contract performance."  See Lewis Aff., Exh. A, § C, at 1.3.4; Def.'s App. 1, § C, at 1.3.4.

2.      Count I:  Hazardous Waste Management

On January 24, 2006, defendant sent a letter to LB&B regarding the maintenance and repair of facilities and handling of hazardous waste for the NAVFAC in Washington. Id. 33, at 1-3.  In the letter, the government highlighted six deficiencies, "all of which are related to longstanding issues."  Id. 33, at 1.  The listed deficiencies were:  failure to comply with the 90-day regulatory storage limit, failure to maintain accurate inventories of hazardous waste, failure to label and identify waste satisfactorily, failure to complete required periodic inspections, failure to provide the required number of qualified personnel at each site and generally poor housekeeping and maintenance of the storage areas.  Id. 33, at 1-2.  The government concluded the letter by warning plaintiff that its "continued inability to perform, whether intentional or unintentional, could be construed as anticipatory repudiation of the contract requirement and cause for a default action."  Id. 33, at 2-3.

The government sent a second letter to plaintiff on February 14, 2006, stating that as a result of plaintiff's failure to demonstrate visible progress in curing the deficiencies identified in the January 24, 2006 letter, the government was considering partial termination of the Contract.  Id. 33, at 4.  The parties met the next morning.  See id. 33, at 4 ("To clarify the government's position at the meeting this morning . . . .") (emphasis added).  Edward Charette, a member of the NAVFAC acquisition team, sent an e-mail following the meeting stating the government's position:  that the government was "prepared to terminate the Hazardous Waste Management portion of the contract unless [plaintiff] take[s] our recommendation [and] . . . hire[s] a dedicated subcontractor, approved by [the government], for that portion of the work."  Id. 33, at 5.  The government cited and included a copy of 48 C.F.R. § 49.402-4 in the February 15, 2006 e-mail.  Id. 33, at 6.  FAR § 49.402-4 permits "the contractor to continue performance of the contract by means of a subcontract" as an alternative to termination for default.  48 C.F.R. § 49.402-4 (2008); Def.'s App. 33, at 6.

8

LB&B hired a subcontractor to perform the hazardous waste management duties of its Contract.[5]  Compl. ¶¶ 19-20.  On March 21, 2007, plaintiff submitted a formal claim to the Navy's Contracting Officer requesting compensation in the amount of $208,889.16, the cost to hire a subcontractor to fulfill its hazardous waste management duties.  Compl. ¶ 23; Def.'s App. 34.  Plaintiff asserts that it is due this amount as a result of the increased cost it incurred when it hired a subcontractor to complete the hazardous waste management duties.  Compl. ¶ 23; Def.'s App. 34.  On July 10, 2007, Dean E. Koepp, CO for NAVFAC, denied plaintiff's claim in its entirety.  Compl. ¶ 24; Def.'s App. 34.  The government reiterated its earlier statements that "LB&B had failed to perform some services . . . [and that] [w]hen LB&B failed to show visible progress to cure the conditions endangering performance," the government exercised its right under FAR § 49.402-4 and required plaintiff to hire a subcontractor in lieu of termination of the Contract by default.  Def.'s App. 34; see Def.'s App. 33, at 5-6; Compl. ¶ 20.  The government asserts that, because LB&B was responsible for curing any deficiency in performance, LB&B is responsible for the any additional costs it incurred in hiring the subcontractor.  Def.'s Resp. 6-7.

3.      Count II:  On-site Personnel Supervision

The Contract also required LB&B to provide management services and to "[m]anage the total work effort associated with the services required."  Pl.'s Mem. 5; Def.'s App. 1, § C, at 1.3.2.  The Contract did not specify the staffing that would be required; however, Project Staffing was one of four equally-weighted technical factors NAVFAC considered in awarding the Contract.  Lewis Aff., Exh. A, § M.3; Def.'s App. 1, § M.3.  In its bid, LB&B stated its intention to employ three site forepersons.  Pl.'s Mem. 6-7; see, e.g., Lewis Aff., Exh. C, at § 2.1.  In Table 2.1.3-1, Number of Resources by Labor Category, plaintiff identifies three site forepersons, one at each major site:  Naval District Washington, NNMC and NRL.  Lewis Aff., Exh. C, at § 2.1.3.  In addition to the three site forepersons, plaintiff also lists two full-time foreperson positions for IDQ work.  Id.  An organizational flowchart submitted as part of plaintiff's bid lists a total of ten forepersons and managers.  Lewis Aff., Exh. C, Figure 2.4.2-1.  Neither plaintiff's Complaint nor its Memorandum offers any explanation of the role that the IDQ forepersons or the managers play in site supervision.  See Pl.'s Mem. 5-8 (making no reference to any employee except the three site forepersons).  LB&B asserts that the

---

[5] Neither party has specified the date on which the subcontractor began working for plaintiff.  Neither party has specified the identity of the subcontractor.  The court does not find either of these matters to be genuine issues of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

government directed it at various times to provide full-time on-site supervision at additional work sites. See Dell Decl. ¶ 6.

NAVFAC directed LB&B to provide additional supervision. Pl.'s Mem. 8. Neither party has offered the court any specific information regarding this request and the court cannot determine when this request was made or if any reason was given for the request. See Compl. ¶¶ 28-29 (stating that NAVFAC required additional supervision but providing no other details); Pl.'s Mem. 8, 12 (same); Pl.'s Reply 4-5 (same). The government asserts that LB&B was responsible for providing service to smaller work sites including Arlington Service Center and Naval Observatory. Def.'s Resp. 8. LB&B asserts that the Navy requested that LB&B provide full-time supervision for the smaller work sites: Naval Air Facility Andrews, the Defense Information Systems Agency at the Arlington Service Center and for the U.S. Naval Observatory. Pl.'s Mem. 8. Neither party attempts to define the quantity or quality of work that was required to satisfy the Contract requirement. The parties do not agree whether the requirement was that plaintiff "provide service," Def.'s Resp. 8, provide "on-site, full time supervision," Pl.'s Reply 5, or "[m]anage the total work effort associated with the services required," Def.'s App. 1, § C, at 1.3.2; Lewis Aff., Exh. A, § C, at 1.3.2.

On March 28, 2007 LB&B submitted a second formal claim to recover excess costs associated with additional site supervision directed by the Navy. Compl. ¶ 30; Def.'s App. 35. Plaintiff asserts that, because its bid did not list full-time, on-site supervision for Arlington Service Center and for Naval Observatory, see Lewis Aff., Exh. C. 2.4.2-1 (Table), NAVFAC's request that LB&B provide supervision at these locations was an additional requirement that constituted a constructive change by the government. Compl. ¶ 29. The CO denied plaintiff's formal request for an adjustment. Compl. ¶ 30; Def.'s App. 36. In support of his decision, the CO stated that an equitable price adjustment is permitted only if a party demonstrates that the CO requested the contract modification in writing. Def.'s App. 36. According to the government, and uncontested by plaintiff, LB&B did not provide any documentation to support its assertion that the CO had directed a change in the contract in writing. Id. ("LB&B has not provided any supporting documentation that any Government employee or Contracting Officer directed a change in the work to be performed by written order."). On June 12, 2008, LB&B filed its Complaint. See Dkt. No. 1.

II.    Legal Standards

    A.    Jurisdiction

In the Tucker Act, Congress authorized the United States Court of Federal Claims to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2006).  Plaintiff's claim is brought under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601-613 (2006).

The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."  41 U.S.C. § 605(a) (2006).  Jurisdiction is appropriate under the CDA when a contractor "submit[s] in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987).  LB&B submitted two written claims to the CO.  Compl. ¶¶ 23, 30; Def.'s App. 34, 36.  The first claim sought an equitable adjustment for costs incurred as a result of hiring a subcontractor to perform the hazardous waste management services portion of the Contract.  Compl. ¶ 23; Def.'s App. 34.  The second claim sought an equitable adjustment for costs incurred as a result of providing supervision at certain locations.  Compl. ¶ 30; Def.'s App. 36.  The CO denied both claims in their entirety.  Compl. ¶¶ 23, 30; Def.'s Apps. 34, 36.

"[T]he CDA grants jurisdiction to the Court of Federal Claims . . . over a contractor's request for relief only when the appeal or action is based on a qualifying claim filed by the contractor and a final decision by the contracting officer."  Alliant Techsys., Inc. v. United States, 178 F.3d 1260, 1264 (Fed. Cir. 1999) (citing Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995) (en banc)).  Pursuant to the CDA, "[a] claim by a contractor . . . shall be in writing . . . ."  41 U.S.C. § 605(a).  Plaintiff's written claim on Count I was denied by Dean Koepp, Contracting Officer for NAVFAC, on July 10, 2007.  Compl. ¶ 24; Def.'s App. 34.  Plaintiff's written claim on Count II was denied, also by Dean Koepp, on June 12, 2007.  Compl. ¶ 31; Def.'s App. 36.  Plaintiff's complaint was filed on June 12, 2008.  Dkt. No. 1.  LB&B has satisfied the jurisdictional requirements of the CDA by submitting written claims to the CO and timely appealing the denial by the CO of the claims.

B.      Cross Motions for Summary Judgment

Under the Rules of the Court of Federal Claims (RCFC) summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law."[6]  RCFC 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (reviewing Fed. R. Civ. P. 56); Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc. (Anderson), 424 F.3d 1293, 1302 (Fed. Cir. 2005).  A fact is material if it might significantly affect the outcome of the litigation.  See Anderson, 477 U.S. at 248.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See id;  Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986) (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

> In considering such a motion, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted . . . .

RCFC 56(c)(1).  A party defending against a motion for summary judgment must therefore adduce facts to show a material dispute of fact.  See id.  Failure by an opposing party to raise a genuine issue of material fact may result in the court granting summary judgment in favor of the moving party.  See id.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading.  RCFC 56(e).  The adverse party's response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial.  Id.  If the adverse party does not so respond, summary judgment may be entered against the adverse party.  Id.

---

[6] The Rules of the United States Court of Federal Claims (RCFC) were recently amended; the amended RCFC became effective on January 11, 2010.  No changes to the RCFC affect the analysis or outcome of the matters addressed in this Opinion and Order.

The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP).  RCFC 56 Rules Committee Notes ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); see Flowers v. United States, 75 Fed. Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."); Champagne v. United States, 35 Fed. Cl. 198, 205 n.5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP].  Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); see also C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP].  [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c).").  Therefore, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

Under RCFC 56, the court must draw all inferences from the facts before it in the light most favorable to the nonmoving party.  Matsushita, 475 U.S. at 587; Mann v. United States, 334 F.3d 1048, 1050 (Fed. Cir. 2003) (citing Anderson, 477 U.S. at 255).  "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."  Celotex Corp. v. Catrett (Celotex), 477 U.S. 317, 324 (1986).  The nonmoving party will need to present evidence in addition to the pleadings in order to show that a genuine issue for trial exists.  M.A. Mortenson Co. v. United States, 29 Fed. Cl. 82, 94 (1993).

"The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (1986).  To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial."  Celotex, 477 U.S. at 324.  However, the non-movant must establish the existence of a fact that supports a material element on which the party will bear the burden of proof at trial.  Id. at 322-23.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  "Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the court must evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the nonmoving party."  Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).

C.     Equitable Adjustment and Constructive Change of a Performance Contract

"A constructive change occurs where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government."  Miller Elevator Co. v. United States (Miller Elevator), 30 Fed. Cl. 662, 678 (Fed. Cl. 1994).  "A constructive change entails two base components, the change component and the order or fault component.  The 'change' component describes work outside of the scope of the contract,

while the 'order/fault' component describes the reason that the contractor performed the work." Id. (citing Embassy Moving & Storage Co. v. United States (Embassy), 424 F.2d 602, 607 (Ct. Cl. 1970); Al Johnson Constr. Co. v. United States (Al Johnson), 20 Cl. Ct. 184, 204 (1990)). If the government expressly or implicitly ordered work that was outside the scope of the contract, or if the government was at fault in causing work to be done outside the scope of the contract, a constructive change has occurred and plaintiff is entitled to an equitable adjustment of price. Lathan Co. v. United States, 20 Cl. Ct. 122, 128 (1990).

"To recover on its constructive change claim, [plaintiff] must prove that the [government] ordered it to [perform additional work] . . . and that this work was not required under the contract." Al Johnson, 20 Cl. Ct. at 204 (citing Len Co. & Assocs. v. United States, 385 F.2d 438, 443 (Ct. Cl. 1967); Indus. Research Assocs., Inc., DCAB No. WB-5, 68-1 B.C.A. (CCH) ¶ 7069, at 32,685-86 (1968) (finding that the constructive change doctrine is made up of two elements: the change element, which means work is performed outside of the contract requirements, and the order element, which means the work must have been ordered by the government)). "To demonstrate a constructive change for disputes over the contract requirements, the contractor must show the performance of work in addition to or different from that required under the contract (the change component), either by express or implied direction of the Government or by Government fault (the order/fault component)." Miller Elevator, 30 Fed. Cl. at 678-79. The contractor bears the burden of proving it is entitled to an equitable adjustment and proving its damages with sufficient certainty. Lisbon Contractors, Inc. v. United States (Lisbon), 828 F.2d 759, 767 (Fed. Cir. 1987).

Equitable adjustments are a form of corrective measure that the government undertakes to make a contractor whole when the government modifies a contract. Int'l Data Prods. Corp. v. United States (Int'l Data), 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing Ets-Hokin Corp. v. United States, 190 Ct. Cl. 668, 420 F.2d 716, 720 (1970)). A contractor is entitled to an equitable adjustment only if the CO mandates, by written order, a contract modification, and such modification changes the cost of performance. 48 C.F.R. § 52.243-1 (2009). A constructive change requires that the contractor undertake extra work not previously contemplated under a contract; work that cannot be characterized as additional work does not constitute a constructive change. Id.; Int'l Data, 492 F.3d at 1325 (citing Miller Elevator, 30 Fed. Cl. at 678).

A contractor assumes the risk of unexpected costs as a result of difficulties on a firm-fixed-price contract. ITT Arctic Servs., Inc. v. United States (ITT Arctic), 524 F.2d 680, 691 (Ct. Cl. 1975). A firm-fixed-price contract requires the contractor to perform a task for a set price where the "price . . . is not subject to any adjustment on the basis of the

14

contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1 (2008). Firm-fixed-price contracts assign the "risk to the contractor that the actual cost of performance will be higher than the price of the contract." Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996). A firm-fixed-price contract gives the contractor a strong incentive to perform the contract as efficiently as possible, while imposing minimal administrative burden on the parties. 48 C.F.R. § 16.202-1 (2008) ("This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."). The portions of the Contract in dispute are two of the firm-fixed-price portions. Def.'s App. 1; see Pl.'s Mem. 3-8.

D.    Termination for Default

The Contract incorporated by reference provisions of the FAR that govern termination for default. Def.'s App. 1, § I, at 4. Included in the incorporated sections are FAR § 52.249-2, Termination for Convenience of the Government (Fixed-Price), and FAR § 52.249-8, Default (Fixed-Price Supply and Service). FAR § 52.249-2 allows the government to "terminate performance of work under this contract . . . if the Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249-2(a) (2009). "The Government may . . . terminate this contract in whole or in part if the Contractor fails to - - (i) [d]eliver the supplies or to perform the services within the time specified in this contract [or] . . . (iii) [p]erform any of the other provisions of this contract." 48 C.F.R. § 52.249-8(a)(1) (2009). The government's right to terminate for failure of the contractor to perform other provisions of the contract may be exercised only if the contractor does not cure the failure within 10 days after receiving notice from the Contracting Officer. Id. § 52.249-8(a)(2) (2009). The government has the burden of proving that termination for default is appropriate. McDonnell Douglas Corp. v. United States, 567 F.3d 1340, 1351 (Fed. Cir. 2009) (stating that termination must be "based on tangible, direct evidence reflecting the impairment of timely completion"). The government bears the burden of proof regarding whether termination for default was justified, "regardless of the forum and regardless of whose 'claim' is being asserted." Lisbon, 828 F.2d at 765.

Termination for default is a "drastic sanction" and the decision should be made "only for good grounds and on solid evidence." J.D. Headin Constr. Co. v. United States (J.D. Headin), 408 F.2d 434, 431 (Ct. Cl. 1969) (citing Schlesinger v. United States, 390 F.2d 702, 709 (Ct. Cl. 1968)). If there are good grounds and solid evidence to support termination for default, the contracting officer has the discretion to terminate the contract for default, and in certain circumstances may be obligated to do so. Schlesinger, 390 F.2d

15

at 707-08.  If the government terminates the contract for default and the court later determines that termination for default was inappropriate, plaintiff may be entitled not only to recover any costs it incurred, but may also be entitled to affirmative damages. J.D. Headin, 408 F.2d at 431.

III.    Discussion

A.    Count I:  Hazardous Waste Management

When a party agrees to perform a contract for a fixed sum, the party "will not be excused to become entitled to additional compensation, because unforeseen difficulties are encountered." ITT Arctic, 524 F.2d at 691.  A contractor is not entitled to additional compensation under a firm-fixed-price contract simply because the cost to complete the project was higher than the contractor projected it would be.  See id.  If, however, the higher cost is not a result of unexpected difficulties, but of an express or implicit order by the government to perform additional work outside the scope of the contract, the contractor may be entitled to an equitable adjustment as result of the constructive change. See Miller Elevator, 30 Fed. Cl. at 678.

However, not every change that the government requires triggers a constructive change entitling the contractor to an equitable adjustment.  See Embassy, 424 F.2d at 606-07 (requiring that a constructive change be "some service not required by but within the general scope of the contract").  If a contractor is unable to satisfy the contract requirements, the government may instead opt to terminate the contract for default.  48 C.F.R. § 52.249-8(a)(1) (2009).  In lieu of termination for default, the CO may require the contractor to revise the delivery schedule or hire a third party acceptable to the government to complete the job.  48 C.F.R. § 49.402-4 (2008).  At its discretion, the government may "[p]ermit the contractor to continue performance of the contract by means of a subcontract" rather than terminate the contract for default.  Id. § 49.402-4(b).

The government's January 24, 2006 letter identifies six areas in which plaintiff failed to fulfill its requirements under the Contract. Def.'s App. 33, at 1-2.  In particular, the deficiencies and non-performed work resulted in regulatory non-compliance on the part of the government.  Id. 33, at 2.  The January 24, 2006 letter concludes with the warning that failure on the part of plaintiff to remedy these problems could be cause for default.  Id. 33, at 2-3.  The January 24, 2006 letter was followed by another letter dated February 14, 2006 and an e-mail dated February 15, 2006.  Id. 33, at 4-5.  The February 14, 2006 letter asserts that plaintiff failed to make any progress on the deficiencies identified in the government's January 24, 2006 letter.  Id. 33, at 4.  The February 15, 2006 e-mail references a meeting that had occurred earlier on that date to discuss contract

deficiencies. Id. 33, at 4. The e-mail recapitulates the government's position at the meeting: "[the government was] prepared to terminate the Hazardous Waste Management portion of the contract, unless [plaintiff] take[s the government's] recommendation [to] hire a dedicated subcontractor, approved by [the government], for that portion of the work," as contemplated by FAR § 49.402-4. Id. 33, at 5.

Plaintiff asserts in its Complaint that it made other suggestions to the government about ways in which it could resolve any perceived problems relating to plaintiff's performance of the hazardous waste management services, but that the government rejected all of its suggestions. Compl. ¶ 18. Plaintiff further asserts that the government's directive that plaintiff hire a subcontractor constitutes a constructive change entitling it to equitable adjustment. Compl. ¶ 22. Plaintiff does not dispute the government's entitlement under FAR § 49.402-4 to require a contractor to hire a subcontractor in lieu of termination for default. See supra note 3. Moreover, plaintiff fails to offer any evidence to contradict the assertions raised in the January 24, 2006 letter, or otherwise to raise any genuine issue of material fact contesting the government's entitlement to terminate the contract for default. See, e.g., Pl.'s Mem. (arguing for an equitable adjustment of the Contract, but failing to address the government's entitlement to termination of the Contract default).

1.      Plaintiff's Motion for Summary Judgment

Count I of plaintiff's Motion seeks summary judgment that plaintiff is entitled to an equitable adjustment as a result of costs incurred hiring a subcontractor to provide waste management services. See Compl. ¶¶ 22, 25. This is an issue on which plaintiff has the burden of proof; plaintiff must establish that the costs incurred were a result of a constructive change. Teledyne McCormick-Selph v. United States, 588 F.2d 808, 810 (Ct. Cl. 1978). A contractor who seeks an equitable adjustment has the "burden of proving liability, causation, and the resultant injury." Ralph L. Jones v. United States, 33 Fed. Cl. 327, 331 (1995). LB&B has the burden to prove that hiring a subcontractor was an addition to the contract and that the government was at fault in directing the addition. See Int'l Data, 492 F.3d at 1325.

Plaintiff asserts that the Contract does not require plaintiff to hire a subcontractor to perform the hazardous waste removal. Pl.'s Mem. 11. The government, in response, addresses plaintiff's contention in two steps. First, the government – the non-movant for purposes of plaintiff's motion for summary judgment – has adduced evidence to establish plaintiff's failure to conform to the hazardous waste provisions of the Contract. Def.'s App. 33, at 1-3. Second, the government asserts, and supports through documentation,

that it required plaintiff to hire the subcontractor in lieu of termination for default, id. 33, at 4-6, as it was entitled to do under the Contract.

The FAR expressly permits the government to require a contractor to use a subcontractor in lieu of termination for default.  See C.F.R. § 49.402-4 (2008).  In the January 24, 2006 letter, the government details plaintiff's failure to fulfill its contractual obligations.  Def.'s App. 33, 1-3.  The government's February 15, 2006 e-mail documents the government's meeting with plaintiff to discuss the hazardous waste management services required under the Contract, Def.'s App. 33, at 5, a fact plaintiff does not dispute.  See Pl.'s Mem. 4.  Plaintiff has failed to provide any "pleadings, depositions, answers to interrogatories, [or] admissions on file" to dispute the government's assertion that the government's requirement that plaintiff hire a subcontractor was permissible in lieu of termination by default when plaintiff failed to fulfill its obligations under the Contract.  See RCFC 56(c).  Viewing the evidence in the light most favorable to the government, the court finds that plaintiff is unable to demonstrate that it is entitled to judgment as a matter of law.  For the foregoing reasons, plaintiff's Motion on Count I is DENIED.

2.      Defendant's Motion for Summary Judgment

Defendant seeks summary judgment on Count I based on the grounds that there is no genuine issue as to any material fact.  Def.'s Resp. 1.  Defendant asserts that the hazardous waste management services portion of the Contract was a firm-fixed-price portion of the Contract and that LB&B accepted the performance risk.  Id. 4-6.  The Contract stated that LB&B was required to provide the necessary management, staff, and personnel to accomplish the work under the Contract.  Def.'s App. 1, § C, at 1.3.2; Lewis Aff., Exh. A, § C, at 1.3.2.  The Contract required plaintiff to collect, store and dispose of hazardous waste in compliance with all applicable standards and maintain proper records regarding its activities.  Def.'s App. 1, § C, at 5.2.3.6; Lewis Aff., Exh. A, § C, at 5.2.3.6.  Work that cannot be characterized as additional to the contract does not constitute a change at all, constructive or otherwise.  Int'l Data, 492 F.3d at 1325.

The government asserts that plaintiff repeatedly failed to execute the hazardous waste management function required under the Contract.  Def.'s App. 33, at 1-3.  Further, the government asserts that hiring a subcontractor merely allowed LB&B to provide satisfactory performance; it was not an addition to the Contract.  Def.'s Resp. 9.  On March 21, 2007, plaintiff submitted an invoice to the government, purportedly for the costs LB&B incurred as a result "of the Government's direction to have LB&B subcontract out the hazardous waste service at a much higher cost."  Def.'s App. 33, at 7.  Plaintiff has failed to assert or to provide any documentation to establish that the work

18

completed by the subcontractor – and paid for by LB&B – was "in addition" to the work required by the Contract. Id. 33, at 8-11. In fact, plaintiff's own invoice does not claim that the work was other than "the hazardous waste service" required by the Contract. Id. 33, at 7. Plaintiff's complaint is simply that the work was at "a much higher cost," a fact that, without more, does not challenge defendant's entitlement to summary judgment. Id.

The government asserts that it gave plaintiff the choice to hire a subcontractor or to terminate the hazardous waste management section of the Contract. Def.'s Resp. 9; Pl.'s Reply 3 n.1. The government has the burden to prove that it was entitled to terminate the contract for default. McDonnell Douglas Corp., 567 F.3d at 1351. Under the Contract, the government is permitted to terminate performance of work if the CO determines that a termination is in the government's interest. Def.'s App. 1, § I, at 4 (incorporating 48 C.F.R. § 52.249-2 by reference); see 48 C.F.R. § 52.249-2(a) (2009) ("The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest."). The government is entitled to summary judgment if the record taken as a whole demonstrates that there is no genuine issue of material fact, RCFC 56(c), and that the government was entitled to terminate the contract for default. See Def.'s App. 1, § I, at 2. The government submitted to the court the January 24, 2006 letter that it sent to plaintiff detailing plaintiff's continued failure to execute the requirements of the Contract. Def.'s App. 33, at 1-3. The January 24, 2006 letter provided details concerning the various ways plaintiff had failed to meet the terms of the contract. Def.'s App. 33, at 1-3. Further, plaintiff has failed to provide any evidence to dispute the government's description of plaintiff's performance in the January 24, 2006 letter or otherwise dispute the government's determination that termination would be appropriate.

A party defending against summary judgment may not rest upon mere denials of allegations. See RCFC 56(e). A party must offer evidence sufficient to establish that a genuine issue of material fact exists on an issue for which it has the burden of proof. See RCFC 56(c)(1). Plaintiff has failed to provide evidence sufficient to demonstrate that there is a genuine issue of material fact regarding Count I. Defendant's Motion for Summary Judgment on Count I is GRANTED.

B.      Count II:  On-site Personnel Supervision

Plaintiff submitted a technical proposal to the government as part of its bid for the Contract. See Lewis Aff., Exhs. B, C. The parties agree that the Contract required plaintiff to "[m]anage the total work effort associated with the [Contract]." Lewis Aff., Exh. A, § C, at 1.3.2; Def.'s App. 1, § C, at 1.3.2. The parties also agree that plaintiff would "have the responsibility and authority to direct and manage all aspects of this

project . . . ."  Def.'s Facts ¶ 14; see Lewis Aff., Exh. B, § 3.4.1.  Further, the parties agree that the Contract required plaintiff to provide management sufficient "to assure competent and complete contract performance."  Lewis Aff., Exh. A, § C, at 1.3.4; Def.'s App. 1, § C, at 1.3.4.  The parties are unable to agree upon, or provide support for, anything except these general provisions:  that plaintiff should manage the total work effort and all aspects of the Contract and that plaintiff should assure complete and competent performance.  See, e.g., Pl.'s Mem. 5; Def.'s Facts ¶¶ 5, 14; Lewis Aff., Exhs. A, § C, at 1.3.4, B, § 3.4.1; Def.'s App. 1, § C, at 1.3.4.

In order to determine whether a constructive change took place, the court must first determine whether the government required plaintiff to perform work that was "in addition" to the work required by the Contract.  See Al Johnson, 20 Cl. Ct. at 204 (articulating that constructive change requires work be outside the contract requirements); see also Embassy, 424 F.2d at 607.  In order to determine whether work was "in addition" to what the Contract required, the court must first determine what the Contract required. Plaintiff simply asserts, without support, that NAVFAC's requirement that LB&B provide full-time, on-site supervision at the three sites was in addition to what the Contract required.  Pl.'s Facts ¶¶ 31-32; Pl.'s Reply 5.  Defendant simply asserts, without support, that the supervision at issue was required by the Contract.  Def.'s Resp. 8.  The issue before the court is whether the supervision required by NAVFAC was "in addition" to the supervision that was necessary to manage the total work effort and all aspects of the Contract and to assure complete and competent performance.[7]  On March 28, 2007 LB&B submitted a claim for the costs associated with this on-site supervision which was denied in full by the Contracting Officer on June 12, 2007.  Compl. ¶ 31; Def.'s App. 35.

    1.       Plaintiff's Motion for Summary Judgment

---

[7] The parties discuss at length the question of whether or not plaintiff's technical proposal was incorporated into the Contract.  See Pl.'s Mem. ¶ 9; Def.'s Resp. Facts ¶ 9.  Plaintiff points to section L of the Solicitation for the proposition that "[t]he technical proposal presented by the offeror to whom the award is made will be incorporated, in part or in full, into the contract at time of the award."  Pl.'s Mem. 4 (citing Lewis Aff., Exh. A, § L) (emphasis altered).  Defendant relies on a similar clause contained in section B of the Solicitation that reads:  "[the] technical proposal 'may be incorporated in part or in full into this contract upon award by reference . . . .'"  Def.'s Resp. Facts ¶ 9 (quoting Def.'s App. 1, § B.4) (emphasis added); see Def.'s Reply 1 n.1. Notwithstanding the foregoing dispute, the parties agree that the government reserved for itself the discretion to incorporate proposals "in part or in full."  Pl.'s Mem. 4; Def.'s Resp. Facts ¶ 9. Unfortunately, neither party has addressed whether any such incorporation in fact occurred in this case.

Plaintiff asserts that "NAVFAC constructively changed the Contract specifications and as a result is liable to equitably adjust the Contract price to reflect the excess costs LB&B incurred as a result of NAVFAC's changes to the Contract."  Pl.'s Mem. 10. Specifically, plaintiff states that "NAVFAC directed LB&B at various times to provide on-site, full-time supervision at these Additional Worksites."  Pl.'s Facts ¶ 32 ("NAVFAC directed LB&B at various times to provide on-site, full-time supervision at [National Navy Medical Center, the Naval Research Laboratory and the Naval District Washington].");  see Dell Decl. ¶ 6.  Plaintiff asserts that it did not propose to provide site supervision at the "Additional Worksites."  Pl.'s Mem. 12.  LB&B asserts that because its technical proposal was incorporated into the Contract upon acceptance, LB&B's site supervision and proposed staffing levels became part of the Contract specifications.  Id. However, LB&B acknowledges that its terms could be accepted in whole or in part.  Pl.'s Mem. 4 (emphasis added).  LB&B has offered no evidence to support its implied assertion that the level of supervision required by the government was in addition to the level of supervision contemplated by the Contract.

Plaintiff submitted to the court the technical proposal it had submitted as part of its bid.  See Lewis Aff., Exhs. B, C.  In its Memorandum, plaintiff reiterates its decision to have only three site forepersons.  Pl.'s Facts ¶¶ 22-23.  Nowhere does plaintiff mention any other forepersons or managers.  See id.  In its technical proposal, however, plaintiff provided for both the three site forepersons and for two IDQ forepersons and a hazardous waste foreperson/manager.  Lewis Aff., Exh. C, at Figure 2.4.2-1.  Plaintiff's technical proposal also provided for four additional managers.  Id.  In total, plaintiff incorporates ten forepersons and managers into its organizational flowchart.  Id.  Despite its inclusion of ten supervisory positions in its technical proposal, plaintiff fails to provide any information about the role of the on-site forepersons or of the managers.  Plaintiff further fails to provide any information regarding the nature of additional management that NAVFAC required it perform, other than its repeated statement that NAVFAC required "on-site, full time supervision."  Pl.'s Mem. 12; Pl.'s Reply. 5.

The Contract provides little additional guidance.  See Lewis Aff., Exh. A, § C, at 1.3; Def.'s App. 1, § C, at 1.3.  Plaintiff was required to "[m]anage the total work effort associated with the services required.  Management includes, but is not limited to, personnel management, management staffing, work control, and work reception."  Lewis Aff., Exh. A, § C, at 1.3.2; Def.'s App. 1, § C, at 1.3.2.

A constructive change can occur only if the directed action is outside the "objective or standard to be achieved."  Blake Constr. Co., Inc. v. United States (Blake Constr.), 987 F.2d 743, 745 (Fed. Cir. 1993).  Plaintiff has not asserted that the supervision directed by NAVFAC was outside the "objective or standard to be achieved."

See id.  Plaintiff has asserted only that its technical proposal contemplated three, and only three, site forepersons.  Pl.'s Facts ¶¶ 22-23.  If the additional supervision that NAVFAC directed LB&B to perform was within the "objective or standard to be achieved," see Blake Constr., 987 F.2d at 745, plaintiff may be required to provide those services at the original price.  If the additional supervision that NAVFAC directed LB&B to perform was additional to the Contract, and if this addition was ordered by the government, or was the result of the fault of the government, the plaintiff may be able to recover its excess costs.  See Miller Elevator, 30 Fed. Cl. at 678.  However, plaintiff fails to direct the court to a provision of the Contract, plaintiff's technical proposal, or to any evidence that establishes that the additional level of supervision was unnecessary.  Plaintiff further fails to provide any evidence regarding the nature of the supervision it in fact provided, or that NAVFAC required.

Viewed in the light most favorable to the non-moving party, plaintiff has provided insufficient evidence to support its entitlement to summary judgment.  See Dairyland Power Co-op v. United States (Dairyland), 16 F.3d 1197, 1202 (Fed. Cir. 1994).  For the foregoing reasons, plaintiff's Motion on Count II is DENIED.

2.      Defendant's Motion for Summary Judgment

Defendant also moves for summary judgment on Count II on the basis that there is no genuine issue of material fact.  Def.'s Resp. 1.  The government supports its Motion on the basis that the Contract is a performance contract, and therefore plaintiff is responsible for completing performance regardless of cost.  Def.'s Resp. 4-5.  Defendant asserts that equitable adjustment is improper because "LB&B has not argued that it was required to perform work that went beyond the scope of the [C]ontract."  Def.'s Reply 3.

Performance contracts "'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.'"  Blake Constr., 987 F.2d at 745 (quoting J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969)).  Defendant asserts that the objective of the Contact was to provide "'the management, staff, organization, supervision and personnel required' to accomplish the work."  Def.'s Resp. 7.  Defendant asserts that, because the Contract was a performance contract, plaintiff is not entitled to additional money simply because the required performance was more expensive than anticipated.  Def.'s Resp. 6-7.  However, the question before the court is whether plaintiff satisfied "the objective or standard to be achieved."  See Blake Constr., 987 F.2d at 745.

With regard to the required level of management, the Contract states only that the contractor should "[m]anage the total work effort associated with the services required." Def.'s App. 1, § C, at 1.3.2.  Under a performance contract, the service provider is required to complete performance as required by the contract.  See Blake Constr., 987 F.2d at 745.  The government has provided no evidence that shows that the staffing plaintiff used failed to "[m]anage the total work effort associated with the services required" by the Contract.  See Def.'s App. 1, § C, at 1.3.2.

If the additional supervision that NAVFAC directed LB&B to perform was within the "objective or standard to be achieved," see id., plaintiff may be required to provide those services at the Contract price.  If the additional supervision that NAVFAC directed LB&B to perform was additional to the work required by the Contract, and if this addition was ordered by or obtained by the fault of the government, plaintiff may be able to recover its excess costs.  See Miller Elevator, 30 Fed. Cl. at 678.  Defendant has failed to provide sufficient information to support its assertion that the supervision at the three additional sites – Arlington Center, Naval Air Facility Andrews and Naval Observatory – was within the scope of the Contract, that is, required to complete Contract performance. Viewed in the light most favorable to the non-moving party, defendant has provided insufficient evidence to support an assertion of fact on which it would bear the burden of proof at trial.  See Dairyland, 16 F.3d at 1202.

For the foregoing reasons, defendant's Motion on Count II is DENIED.

IV.     Conclusion

For the foregoing reasons, plaintiff's Motion for Summary Judgment on Count I is DENIED.  Defendant's Motion for Summary Judgment on Count I is GRANTED. Plaintiff's Motion for Summary Judgment on Count II is DENIED.  Defendant's Motion for Summary Judgment on Count II is DENIED.

As to Counts II through VII, the parties are directed to file a Joint Status Report on or before Wednesday, February 24, 2010.  The Joint Status Report shall include a proposed schedule for the completion of all discovery.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

23